BRIAN J. FOLEY v. HUNTINGTON COMPANY ET AL.
(13331)

Dupont, C. J., and Lavery and Hennessy, Js.

Argued February 16—officially released August 27, 1996

*Louis R. Pepe,* with whom were *Thomas J. Rechen* and, on the brief, *James G. Green, Jr.,* for the appellant-appellee (plaintiff).

*Dion W. Moore,* with whom was *James T. Shearin,* for the appellees-appellants (defendant Southport Manor Convalescent Center, Inc., et al.).

DUPONT, C. J. The issues of this appeal by the plaintiff are whether the trial court improperly (1) set aside a jury verdict awarding the plaintiff damages for breach of contract and rendered judgment notwithstanding the verdict, (2) refused to award prejudgment interest on the jury's award of damages, and (3) excluded the plaintiff's evidence on lost profits. Other issues raised by the defendants'[1] cross appeal are whether the trial court

---

[1] The defendants involved in this appeal are the Southport Manor Convalescent Center, Inc., and Albert A. Garofalo, and the word defendants applies

improperly (1) failed to set aside a jury award of damages for the plaintiff for negligent misrepresentation and (2) ordered the return of the plaintiff's deposits made pursuant to a contract of the parties.

The record reveals the facts and procedural history that follow. On September 30, 1984, the defendants entered into a contract, secured by a down payment of $5000, to sell Southport Manor Convalescent Center, Inc. (Southport Manor), a 140 bed nursing home in the town of Fairfield, to the plaintiff at a cost of $5,250,000. The contract provided for a closing date of October 30, 1984, and required an additional deposit of $150,000 from the plaintiff on or before October 15, 1984.

The dispute of the parties primarily centers about the amount of land that the parties intended to sell and buy. The plaintiff was interested in purchasing enough land to operate the nursing home, and, therefore, the defendant Garofalo hired Huntington Company, a licensed surveyor company, to propose a description. Although the nursing home was located on a 10.09 acre tract of land, the contract provided for the sale of 3.74 acres of that tract as measured from a line drawn by the surveyor fifty feet from the nursing home and parking lots.

Several disputes arose among the parties concerning the performance of the contract. First, the plaintiff claimed that Garofalo failed to provide notice of the pending sale to the department of health services as promised. This notice was required for the plaintiff to receive financing, state approval for the transfer, and a license to operate the facility. The plaintiff withheld the additional deposit payment and brought an action for injunctive relief, requesting that the defendants be restrained from conveying or encumbering the prop-

only to them. The defendants involved in the trial also included Huntington Company, David S. Huntington and Anne P. Toth.

erty, and for specific performance, requesting that Garofalo be compelled to perform the contract. The defendants claimed that the plaintiff breached the contract by failing to make the additional deposit payment.

On November 9, 1984, the trial court held a hearing on the plaintiff's motion for a temporary injunction, and, after a partial hearing, the parties agreed to the following judgment rendered by the trial court: "What I'll do is right now enter by stipulation, I'll enter reformation of the contract, and the only reformation will be an extension of time for the down payment. And the reformation will further state that the notice to the state of Connecticut department of health services will be simultaneous with the payment of $150,000 down payment. The time for both of those acts is extended to November 16, 1984, and the closing will take place on this premises on or before December 30. I will extend the October 30 date to December 30. Now, that's all I am going to do. I'm going to reform the contract to that extent." The plaintiff made the additional deposit, and the defendant delivered to the plaintiff the appropriate letter addressed to the department of health services.

Prior to the new closing date, the plaintiff's attorney discovered that the 3.74 acre tract of land, which the nursing home would occupy after the sale, was in violation of the town of Fairfield's zoning requirements. The plaintiff offered several solutions, including one that would require Garofalo to seek a variance or a zone change from the town to allow the nursing home to occupy a 3.74 acre parcel, another that would require Garofalo to convey the entire 10.09 acre parcel to the plaintiff and to accept a lease from the plaintiff for the difference between 10.09 and 3.74 acres, another that would permit the plaintiff to purchase the ten acre parcel outright, and another that would require Garofalo to provide the plaintiff with a ninety-nine year ground lease for the 3.74 acres at the same price as a

purchase in fee simple. The defendants rejected these suggestions, maintained that they could not close the transaction because they could not deliver marketable title, and offered a full refund. This delay cost the plaintiff $51,000 in financing extensions penalties.

The plaintiff moved to hold the defendants in contempt of court for their alleged failure to comply with the judgment rendered on November 9, 1984. On September 23, 1985, the trial court did not hold the defendants in contempt, but ordered that "they make an application for a variance and take whatever steps are necessary to comply with the intent of the contract." The defendants agreed to apply for a variance, and the trial court continued the case to December 16, 1985.[2]

The defendants failed to apply for a variance and claimed that, after speaking with town officials, it became apparent that the application would ultimately be denied or would not be feasible. On March 31, 1986, as a result of the plaintiff's motion, the trial court found Garofalo in contempt of court because of his bad faith failure to apply for a variance and imposed sanctions. Garofalo appealed to this court from the judgment of contempt.

After concluding that the original court order constituted a reformation of the original contract and not a judgment for specific performance, we set aside the judgment of contempt and remanded the case with direction to deny the plaintiff's motion to hold the defendant in contempt of court. See *Foley* v. *Southport Manor Convalescent Center, Inc.*, 11 Conn. App. 530, 536, 528 A.2d 841, cert. denied, 205 Conn. 805, 531 A.2d 935 (1987) (*Foley I*).

On October 13, 1987, the plaintiff made a motion for a supplemental judgment of specific performance of

---

[2] At this point, the parties and the court apparently were in agreement as to the intent of the parties.

the reformed contract and cited a footnote in *Foley I* as support for this motion. See id., 537 n.4. The trial court denied the motion, and we affirmed the denial on different grounds. *Foley* v. *Southport Manor Convalescent Center, Inc.*, 19 Conn. App. 239, 245, 561 A.2d 978 (1989) (*Foley II*). In *Foley II* we noted that the footnote in *Foley I* had been misconstrued by the plaintiff and stated that the proper action for the plaintiff would have been to initiate a new suit claiming a breach of the reformed contract and requesting the relief of specific performance. *Foley II*, supra, 244–45.

Thereafter, the plaintiff brought this action[3] against Huntington Company, David S. Huntington, Southport Manor, Albert A. Garofalo, and Anne P. Toth. As to the claims against the defendants Garofalo and Southport Manor, the plaintiff alleged breach of contract, negligent and fraudulent misrepresentation, and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. He sought declaratory relief, monetary damages and specific performance. The defendants asserted numerous special defenses, including, but not limited to, that the claims were barred by General Statutes §§ 52-577 and 42-110g and the statute of frauds, that proof of the breach of contract claim was limited by the parol evidence rule, that the remedies sought were limited by the contract, that the plaintiff's own negligence estopped him from claiming any injury or reliance, that the plaintiff breached the contract first, that the contract could not be performed due to zoning regulations, and that the claims were barred by res judicata.

---

[3] A prior declaratory judgment action brought by Southport Manor and Garofalo against the plaintiff concerned a trial court's granting of a motion to dismiss. We upheld the trial court's judgment granting the defendants' motion to dismiss; *Southport Manor Convalescent Center, Inc.* v. *Foley*, 20 Conn. App. 223, 565 A.2d 878 (1989); but it was later determined that the motion to dismiss should not have been granted. *Southport Manor Convalescent Center, Inc.* v. *Foley*, 216 Conn. 11, 578 A.2d 646 (1990).

The defendants also counterclaimed and sought declaratory relief pursuant to General Statutes § 52-29 to declare the rights and other legal relations in and to the contract, and brought claims of a breach of contract, misrepresentation, negligence, and unfair trade practices against the plaintiff. The plaintiff denied these counterclaims and asserted several special defenses, including that the claims and setoffs failed to state a claim or setoff recognized under Connecticut law and that the claims were barred by the doctrines of res judicata and collateral estoppel.

I

## THE JURY VERDICTS

The jury found in favor of the plaintiff against Garofalo and Southport Manor on the breach of contract and negligent misrepresentation claims, in favor of the Huntington defendants on a negligence claim, and in favor of Garofalo and Southport Manor on the fraudulent misrepresentation claim.[4] The court accepted the

---

[4] Interrogatories were submitted to the jury, and the jury answered the relevant interrogatories as follows:

"1. Did the Southport defendants make a fraudulent misrepresentation which the plaintiff relied upon that the parcel of land to be conveyed would be large enough to operate a nursing home under applicable governmental regulations? No

"2. Did the Southport defendants make a negligent misrepresentation which the plaintiff relied upon that the parcel of land to be conveyed would be large enough to operate a nursing home under applicable governmental regulations? Yes . . . .

"6. Do you find that Foley and the Southport defendants intended that the written contract (Exhibits D & E) would cover the rights and obligations of the parties in connection with the purchase and sale of Southport Manor and supersede all other prior agreements, written or oral? Yes

"7. Do you find that Foley agreed to buy and the Southport defendants agreed to sell the property described in and attached to the contract? Yes

"8. Do you find that, under the terms of the contract, Mr. Foley and Southport defendants agreed and intended that zoning restrictions were the responsibility of Mr. Foley and/or excepted from marketable title? No

"9. Do you find that Mr. Foley was not willing to take the property described in the contract with the zoning restriction on coverage? Yes

verdicts as to liability and accepted the answers to the interrogatories and then committed the action to the jury to decide the issue of damages due the plaintiff from the defendants Southport Manor and Garofalo. The jury was expressly told by the court not to include the down payment of $155,000 in its calculation of damages because the court had reserved the issue to itself to be determined after the court decided whether specific performance was appropriate. The court subsequently denied specific performance and stated that "[t]he plaintiff is entitled a refund of $155,000, the amount of the deposit on the contract, in addition to any amounts that the plaintiff may be entitled to based upon the jury's verdict." The jury awarded the plaintiff $5001 for the negligent misrepresentation and $938,000 for the breach of contract, for damages in the total amount of $943,001.

Southport Manor and Garofalo moved for a directed verdict after the close of the plaintiff's case, which motion was denied, and they subsequently moved to set aside the verdict, which motion was granted in part and denied in part by the trial court.[5] We first discuss the claims of the appeal and the cross appeal that relate to the jury's verdict.

The defendants claim in their cross appeal that there was insufficient evidence from which a jury could find negligent misrepresentation. The trial court concluded

"10. Do you find that both Mr. Foley and Southport defendants were unaware of the zoning restrictions at the time of signing the contract and that the contract was unable to be performed because of mutual mistake? No

"11. Did the Southport defendants breach the contract with the plaintiff? Yes"

[5] The trial court refused to set aside the jury's award of $5,001, the amount the jury awarded to the plaintiff for negligent misrepresentation, but it set aside the verdict for the plaintiff in the amount of $938,000, which the jury had awarded for breach of contract. It then rendered judgment for the plaintiff in the total amount of $160,001, which represented a return of $155,000, the amount of his deposit on the contract, and $5001.

that there was sufficient evidence to uphold the jury's finding of negligent misrepresentation because there was evidence that Garofalo told the plaintiff before the contract was signed that the defendants would sell enough land to Foley so that he could operate the nursing home. The court, therefore, upheld the jury's verdict of $5001, which the jury had awarded for negligent misrepresentation.

The defendants also argued that since the jury, in interrogatory number six, found the contract to be fully integrated, any prior representations could not be used to supersede the contract. The trial court rejected the argument, citing *Warman* v. *Delaney*, 148 Conn. 469, 474, 172 A.2d 188 (1961). The court stated that "[i]n a claim for misrepresentation, a tort claim, a plaintiff is not seeking to add to or change the terms of the written contract itself, but is claiming inducement to enter into the contract by material misrepresentations of material facts." The court concluded that a jury "could reasonably determine that Foley was induced to enter into the contract by the negligent statement of the defendants that they would sell him enough land to operate a nursing home." The trial court, therefore, concluded that the jury properly awarded damages of $5001, which constituted a nonrefundable application fee paid by the plaintiff as a result of the misrepresentation and nominal damages of $1.

The defendants made no representations or warranties concerning zoning compliance in the contract, and, therefore, they argue that Garofalo's statement that he would sell the plaintiff enough land to operate the nursing home could not have induced the plaintiff to enter into the contract. The jury found to the contrary. A misrepresentation by a seller as to the boundaries of land to be sold, if made negligently or recklessly and relied upon by a buyer without conducting an independent survey, can support an award of damages even if

the written contract constitutes the entire agreement of the parties and the contract specifically disclaims any representations of the seller as to the condition of the land and contains a contrary description of the land. *Warman* v. *Delaney*, supra, 148 Conn. 469; see also *Johnson* v. *Healy*, 176 Conn. 97, 405 A.2d 54 (1978); *Richard* v. *A. Waldman & Sons, Inc.*, 155 Conn. 343, 347, 232 A.2d 307 (1967). The trial court was correct in concluding that the *Warman* decision controls and that the jury had evidence from which it could conclude that the plaintiff was induced to enter into the contract because of a negligent misrepresentation. The misrepresentation was not that a 3.74 acre parcel would meet zoning regulations, but that Garofalo would sell enough land for the operation of a nursing home.

The trial court next considered whether, assuming that the evidence at trial supported a jury finding of breach of contract, the jury award of $938,000 was supported by the evidence. The court concluded that it was supported by the evidence. The plaintiff provided expert testimony that valued the property at $7 million as of the time for performance of the contract. The price fixed in the contract was $5.25 million. The difference between the two figures was the range for damages. Because the amount of damages should equal a sum sufficient to put the plaintiff in the position he would have been in had the contract been performed, the court concluded that the jury had evidence from which it could conclude that the damages could range up to $1,750,000. There was, therefore, evidence for it to determine that $938,000 should be awarded to the plaintiff.

The trial court then analyzed theories to test whether any one of them supported the jury's finding of a breach of contract. The court eliminated all three theories and, therefore, granted the defendant's motion to set aside

the jury's award of $938,000 for the plaintiff's breach of contract claim.

The trial court summarized the theories that could have supported a breach of contract, as follows: "(1) defendants could not convey good and marketable title to the property described in the contract; (2) they failed and refused to convey enough land to operate a nursing home; [or] (3) there was a breach of an implied covenant of good faith and fair dealing by not conveying to the plaintiff a 'lesser estate' of a 3.74 acre ground lease to cure the problem caused by the zoning regulations."

The trial court concluded that the first claim of breach of contract had no merit because the limitations imposed by zoning were excepted from the contract and restrictions imposed by governmental authority, such as zoning regulations, are not a defect affecting marketable title to property. *Frimberger* v. *Anzellotti*, 25 Conn. App. 401, 409, 594 A.2d 1029 (1991). Since the marketable title had not been affected, the trial court found that the jury could not have found that the defendants breached this provision of the contract.

The court also rejected the third claim for breach of contract by stating, "[e]ven though contracts carry an implied covenant of good faith and fair dealing, that concept cannot be used to alter the terms of a written contract between the parties and create additional obligations which were not mutually agreed to or to achieve a result contrary to the clearly expressed terms of the contract. *Verrastro* v. *Middlesex Mutual Ins. Co.*, 207 Conn. 179, 190, 540 A.2d 693 (1988)." The court, therefore, concluded that a breach of contract could be found only if the contract required the defendant to sell "sufficient land to operate a nursing home" instead of the 3.74 acres stated in the contract. Because we hold that the jury could have found, on the basis of the evidence, that there was a breach of contract for failure to convey

enough land to operate a nursing home, we do not discuss the first and third bases that the jury could have used in finding a breach of contract. It is interrogatory number eleven with which we are primarily concerned. In its answer to that question, the jury found that the defendants had breached the contract. The plaintiff argues that the trial court abused its discretion in setting aside the jury's verdict in their favor.

"Directed verdicts are not favored. *Puro* v. *Henry,* 188 Conn. 301, 303, 449 A.2d 176 (1982). *Petyan* v. *Ellis,* 200 Conn. 243, 244, 510 A.2d 1337 (1986). Consequently, [o]ur review of a trial court's refusal to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion. . . . *John T. Brady & Co.* v. *Stamford,* 220 Conn. 432, 440–41, 599 A.2d 370 (1991); *Iseli Co.* v. *Connecticut Light & Power Co.,* 211 Conn. 133, 140, 558 A.2d 966 (1989)." (Citations omitted; internal quotation marks omitted.) *Fleming* v. *Garnett,* 231 Conn. 77, 83, 646 A.2d 1308 (1994). A trial court also may set aside the verdict if it so shocks the sense of justice as to compel the suspicion that the jury was influenced by prejudice, corruption or partiality. *Clay* v. *Teach,* 37 Conn. App. 556, 558–59, 656 A.2d 1065, cert. denied, 234 Conn. 902, 659 A.2d 1205 (1995).

The setting aside of a verdict can occur, therefore, for two general reasons. First, a trial court may set aside a verdict on a finding that the verdict is manifestly unjust because the jury, on the basis of the evidence

presented, mistakenly applied a legal principle or because there is *no* evidence to which the legal principles of the case can be applied. *Maroun* v. *Tarro*, 35 Conn. App. 391, 646 A.2d 251, cert. denied, 231 Conn. 926, 648 A.2d 164 (1994). Second, a verdict may be set aside if its result justifies a suspicion that a juror or jurors were influenced by prejudice, corruption or partiality. A trial court's review of a motion to set aside a verdict, therefore, will focus on one or both of the two tests. The trial court made no finding of jury prejudice, corruption, or partiality, and our analysis, therefore, concerns the first reason only.

Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. See *Gesualdi* v. *Connecticut Co.*, 131 Conn. 622, 627, 41 A.2d 771 (1945). This discretion vested in the trial court is not an arbitrary or capricious discretion, but, rather, it is legal discretion to be exercised within the boundaries of settled law. Id. This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. *Young* v. *Data Switch Corp.*, 231 Conn. 95, 101, 646 A.2d 852 (1994); *Seals* v. *Hickey*, 186 Conn. 337, 350, 441 A.2d 604 (1982). "This right is an obviously immovable limitation on the legal discretion of the court to set aside a verdict. . . ." (Citations omitted; internal quotation marks omitted.) *Young* v. *Data Switch Corp.*, supra, 101. The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict.

While an appellate court must give great weight to a trial court's decision to set aside a verdict, an appellate

court must carefully review the jury's determinations and evidence, given the constitutional right of litigants to have the issues decided by a jury. "Great weight should be given to the action of the trial court and the presumption is that a verdict is set aside only for good and sufficient reason. However, the record must support that presumption and indicate that the verdict demonstrates more than poor judgment on the part of the jury. *Marin* v. *Silva*, [156 Conn. 321, 323, 240 A.2d 909 (1968)]; *Burns* v. *Metropolitan Distributors*, 130 Conn. 226, 228, 33 A.2d 131 [1943]. While we do not attempt to substitute our judgment for that of the trial judge, we must determine whether the jury award was such that the trial judge could have properly substituted his judgment for that of the jury." *Jerz* v. *Humphrey*, 160 Conn. 219, 225, 276 A.2d 884 (1971). An appellate court, therefore, in reviewing whether a trial court abused its legal discretion, must review the entire record and the evidence.

The plaintiff argues that the trial court improperly set aside the verdict because sufficient evidence did exist to establish that the defendants breached their promise to convey enough land to operate a nursing home.

The trial court stated that the contract was not ambiguous, that no express term in the contract obligated the defendants to convey sufficient land to operate a nursing home, and that such an additional promise could not be read into the contract unless it arose by necessary implication from the terms of the agreement. The court also stated that because the jury found that the parties intended the contract to cover all their rights and obligations and to supersede all prior agreements, the parol evidence rule barred any evidence outside of the written contract that would vary or contradict the terms of the written contract. The court found that the record contained no evidence to indicate that the

defendants refused to convey the 3.74 acres and the nursing home described in the contract and, therefore, held that the jury improperly found that the defendants had breached the contract.

The trial court, therefore, determined that the contract was not ambiguous and its construction was a matter of law. The court, however, had given the issue of breach of contract and intent of the parties to the jury to determine, which would indicate that, at the time the jury was charged, the trial court believed that the intent of the parties to the contract presented a factual issue, proper for the jury's resolution.[6]

---

[6] In charging the jury, the trial court stated the following: "Now, intent in a contract is important. Intent is determined from the language used in the agreement, interpreted in light of the surrounding circumstances and in light of the motives of the parties and the purposes which they sought to accomplish. And the existence and terms of the contract are determined from the intent of the parties. But unexpressed intent of one of the parties is of no significance. And to determine intent is a matter of interpretation of the actual contract. Evidence of actual intent is not allowed to vary the terms that are expressed clearly in the written instrument itself. You can consider the practical construction put upon the contract by the parties in making an interpretation of it and the practical construction indicated by the conduct of the parties over a period of time is evidence of their intent. But a promise that is not expressly made will not be read into a contract unless it arises by necessary implication. And conditions upon which a right to require performance of the contract obligation depends may only be implied where not to do so would defeat the clear intent of the parties. . . . Now, as far as a written agreement is concerned, the parties are bound by the terms of that agreement and that's true whether or not they've read all of the agreement or part of the agreement. . . . The law favors the construction of a contract which will make it valid and performable rather than invalid. So you should assume in this case that the contract is valid and is not a nullity or meaningless. And, as I've indicated to you previously, the terms of the contract are construed in the light of the intentions of the parties determined from the language used in the contract itself. And, also, in interpreting the contract you can consider the conduct of the parties to the contract and what they appear to be accomplishing by their actions. Now, you can only apply the terms of the contract as written. So, the contract is to be construed according to what is assumed to be the intention and understanding of the parties by the language used according to the situation of the parties and the circumstances effecting the transaction. In every contract there is an implied covenant of good faith and fair dealing on the

"The construction of a written document is a matter of law, where the meaning is to be ascertained from the document itself; but where the meaning can be understood only from extrinsic facts, the construction is generally a question of fact for the jury. *Jennings* v. *Sherwood*, 8 Conn. 122 [1830]; 1 *Starkie's Evidence*, 429." *School District* v. *Lynch*, 33 Conn. 330, 333 (1866); see also *Security Equities* v. *Giamba*, 210 Conn. 71, 77–78, 553 A.2d 1135 (1989); *Bialowans* v. *Minor*, 209 Conn. 212, 217, 550 A.2d 637 (1988); *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 199, 520 A.2d 208 (1987); *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, 195 Conn. 60, 68, 485 A.2d 1296 (1985); *Lavigne* v. *Lavigne*, 3 Conn. App. 423, 427, 488 A.2d 1290 (1985); *Stelco Industries, Inc.* v. *Bette*, 2 Conn. App. 17, 20, 475 A.2d 1105 (1984). We, therefore, must resolve the issue of whether the contract's construction as to the intent of the parties should have been sent to the jury as a question of fact or whether the trial court in granting the motion to set aside the verdict properly concluded that the contract was unambiguous, thus presenting an issue of law.

part of each party. The concept is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intend. Good faith and fair dealing means an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and, generally, faithfulness to one's duty or obligation and an honest intention not to take advantage of another. Bad faith implies a design to mislead or deceive another or the neglect or refusal to fulfill a duty or contractual obligation not prompted by an honest mistake as to one's rights or duties. Bad faith is not simply bad judgment or negligence but implies the conscious doing of a wrong because of a dishonest purpose or moral obliquity. It contemplates a state of mind affirmatively operating with bad design or ill will. This concept of an implied covenant of good faith and fair dealing is not a separate contractual claim, it's just something that's implied as part of every contract when the parties enter into a contract and it's a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle cannot be applied to achieve a result contrary to the clearly expressed terms of a contract. . . . It does not, however, impose an obligation on a party to agree to different terms or undertake some obligation which was not contained in the contract."

Neither party argues that "3.74 acre parcel" is an ambiguous term. The plaintiff argues that the parties intended to buy and sell an operable nursing home, which included an obligation to sell sufficient land for an operable nursing home. The defendants argue, however, that the contract expressly provided only for the sale of 3.74 acres of land and the nursing home building and that they, therefore, were not obligated under the contract to sell any additional land to make the nursing home operable. We conclude that the construction of the contract was a question of fact for the jury. On the basis of the evidence, it could have concluded that the contract was one for the sale of land on which a nursing home business could be conducted.

The contract provided that the "Seller desires to sell and the Buyer desires to purchase the Premises and all the tangible personal property and such intangible personal property hereinafter specifically described, owned by the Seller, all of which property is utilized in the nursing home business conducted by the Seller . . . ." The premises referenced in the contract were described in a separate attachment as a parcel of real property totaling 3.74 acres and the buildings located on that property, namely Southport Manor. While the addendum clearly described the sale of 3.74 acres along with the buildings on said acres, the contract language indicates that the sale was of a nursing home, which is more than the sale of a building. Whether the parties intended to contract for the sale of a building on 3.74 acres or the sale of an operable nursing home is a question of fact, which properly was submitted to the jury.

"The law is clear that a contract includes not only what is expressly stated therein but also what is necessarily implied from the language used. *Rockwell* v. *New Departure Mfg. Co.*, 102 Conn. 255, 287, 128 Atl. 302 [1925]; 13 C.J. p. 558, § 521. No special form of words,

but that the promise appears upon a fair interpretation, is the essential. 'Not only then may promises exist . . . where the language is in terms that of promise, but also where the agreement shows that the parties . . . have intended an obligation though they failed so to state in clear terms.' 2 Williston, Contracts, p. 1290, § 670. 'If it can be plainly seen from all the provisions of the instrument taken together, that the obligation in question was within the contemplation of the parties when making their contract, or is necessary to carry their intention into effect—in other words, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it.' 6 R.C.L. p. 856, § 244; *Lawler* v. *Murphy*, 58 Conn. 294, 311, 20 Atl. 457 [1889]." *Leventhal* v. *Stratford*, 121 Conn. 290, 295, 184 A. 587 (1936).

"In interpreting the contract, however, not only the whole language of the instrument, but the situation of the parties and the subject-matter of their transactions as well, are to be considered. *Brown* v. *Slater*, 16 Conn. 192, 196 [1844]. 'In arriving at the intent of the parties to a contract as expressed or implied in the language used by them, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence.' *Shaw* v. *Pope*, 80 Conn. 206, 209, 67 Atl. 495 [1907]; *Sonnenberg* v. *Daley*, 86 Conn. 1, 5, 84 Atl. 93 [1912]; *Bryant Electric Co.* v. *Stein*, 95 Conn. 211, 215, 111 Atl. 204 [1920]." Id., 296.

The construction of a contract is usually a question of fact because the interpretation of its language is a search for the intent of the parties, making contractual intent a classic question of fact. *Lavigne* v. *Lavigne*, supra, 3 Conn. App. 427–28. A conclusion as to the intent of the parties by a trier must stand unless it is one that a trier could not reasonably reach. Id. A con-

tract must be construed as a whole, with all relevant provisions considered together. *Bialowans* v. *Minor*, supra, 209 Conn. 217. The intent of the parties is to be garnered in light of the situation of the parties and the circumstances surrounding the contract, along with the primary purpose of the contract. *American Totalisator Systems, Inc.* v. *Dubno*, 210 Conn. 413, 418, 555 A.2d 421 (1989). If the language of the contract is not definitive, the trier may determine what the parties intended. *Finley* v. *Aetna Life & Casualty Co.*, supra, 202 Conn. 199. A factual finding should not be rejected because a trial court would have reached a different conclusion had it been sitting as a fact finder. *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, supra, 195 Conn. 66.

The contract itself provided for the sale of all tangible personal property of Southport Manor and certain assets necessary for operating the business, including employee information and certain licenses. Specifically, the seller agreed to "obtain all Federal, State or Municipal tax clearances or other approvals necessary to transfer the Property and Premises to the Buyer." The contract also provided that "[t]he Seller is a holder of a license issued by the State of Connecticut for the conduct of a nursing home or homes for a total of one hundred-forty (140) beds at the Premises and said license is in full force and effect. The Seller further warrants that said license shall be in full force and effect at the time of closing . . . ." The contract also obligated the seller to "conduct its business in the same dignified and proper manner as previously conducted, complying with all appropriate rules and regulations" and to "comply with all regulatory agencies' requirements regarding change of ownership to allow the Buyer to obtain all necessary licenses, Medicaid and Medicare rates and other necessary requirements." Furthermore, the buyer was not obligated to buy until he

was able to obtain the necessary approval for licensing from the state health department or "such other appropriate agency or agencies." These terms of the contract alone support a jury finding that the parties intended to sell an operable nursing home. Since evidence supported a jury finding that the parties intended the contract to include the sale of an operable nursing home, we will now review the evidence to determine whether the defendants breached this obligation.

Evidence in the record supported a finding that the defendants attempted to frustrate the performance of the terms of the contract. The defendants, in hiring Huntington Company to survey the land and to plot the dimensions, created a lot in violation of zoning regulations and hence caused the nursing home to be inoperable on the lesser acreage of 3.74 acres. The testimony was that the defendant Garofalo, a lawyer, was experienced in the law of real estate, including zoning, and that he had developed several projects, including Southport Manor from its inception. On the basis of this evidence, the jury could have inferred that the defendants should have known that they were not supplying an operable nursing home, as bargained for under the terms of the contract.[7] Testimony also showed that the defendants subsequently refused to

---

[7] Although the jury found the defendants not liable as to the fraudulent misrepresentation claim, which claim was based on the argument that the defendants falsely represented that the contract included sufficient land to operate a nursing home, this finding is not inconsistent with a jury finding that the defendants knew that they were not selling sufficient land to operate a nursing home since a finding of fraudulent misrepresentation requires a higher burden of proof, namely, proof by clear and convincing evidence; *Meyers* v. *Cornwell Quality Tools, Inc.*, 41 Conn. App. 19, 34, 674 A.2d 444 (1996); as opposed to a breach of contract claim, which requires proof by a preponderance of the evidence. *Waicunas* v. *Macari*, 151 Conn. 134, 137, 193 A.2d 709 (1963). Furthermore, the jury found that there was a negligent misrepresentation of the defendants that induced the plaintiff to enter into the contract.

remedy the nonconformity by conveying more land sufficient for a working nursing home.

The jury could make the reasonable inference from the evidence that the defendants' refusal to sell an operable nursing home was not based on an intent of the parties to buy and sell only the described 3.74 acres, but was due to other factors. There was evidence that Garofalo had entered into the contract in order to enjoy the benefits of a soon to change federal law, but subsequently wanted to avoid the contract because, within one week after signing the contract with Foley, Garofalo was negotiating a new sale with a different buyer, for which he might receive $8.5 million. The evidence also supported a finding that the defendants had delayed fulfilling their obligation to supply requisite notice to the department of health services and a list of current employees to the plaintiff, without which the plaintiff could not receive the necessary license approval.

The defendants claim that the parol evidence rule prohibits the use of prior oral statements to vary the terms of a contract and that the evidence discussed previously would violate that rule. "The parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. *Giorgio* v. *Nukem, Inc.*, 31 Conn. App. 169, 173–74, 624 A.2d 896 (1993); see also 2 Restatement (Second), Contracts § 213 (1981). The rule does not forbid the presentation of parol evidence, but prohibits the use of such evidence to vary or contradict the terms of the contract. *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288, 589 A.2d 329 (1991). When a court is faced with an issue of the construction of a contract containing inconsistent clauses, the parol evidence rule does not apply. All relevant evidence is admissible on the issue of contract interpretation, and '[a]ny determination of the meaning or ambiguity should only be made in the light of the relevant evidence of the situation and rela-

tions of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.' . . . 2 Restatement (Second), Contracts § 212, comment (b) (1981). 'The only limitation is that "the asserted meaning must be one to which the language of the writing read in context, is reasonably susceptible in the light of all of the evidence introduced." ' J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 3-15, quoting 2 Restatement (Second), Contracts § 215, comment (b) (1981). The operative question becomes whether parol evidence is offered to contradict the writing or to aid in its interpretation. *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 273, 439 A.2d 314 (1981)." *Shawmut Bank Connecticut, N. A.* v. *Connecticut Limousine Service, Inc.*, 40 Conn. App. 268, 274–75, 670 A.2d 880 (1996).

The evidence admitted in the present case was not used to vary the terms of the contract, but to ascertain the meaning of the terms. The evidence was used to aid in the interpretation of the contract and to determine the intent of the parties. The parol evidence rule does not prevent the introduction of evidence to show the facts and circumstances existing at the time of execution; *Security Equities* v. *Giamba*, supra, 210 Conn. 77–78; and parol evidence is admissible to explain an ambiguity in a contract or to prove a collateral oral agreement that does not vary the terms of the contract. *Stelco Industries, Inc.* v. *Bette*, supra, 2 Conn. App. 23. The parol evidence rule, therefore, should not have been invoked in this case to prevent the consideration and utilization of this evidence.

Even though the jury found that "the written contract would cover the rights and obligations of the parties in connection with the purchase and sale of Southport Manor and supersede all other prior agreements, written or oral," this finding does not necessarily exclude

a jury finding that the contract included the obligation that the defendant sell an operable nursing home, including sufficient land for its operation. An integrated contract can be subject to factual interpretations as to the intent of the parties.

The defendants also argue that the trial court properly held that the plaintiff's interpretation of the contract was barred by the statute of frauds because the additional obligation of "enough land to operate a nursing home" constitutes an oral contract that is unenforceable by law.[8] The statute of frauds applies to interests in land and requires a written instrument for transfers of land. In this case, a written contract for the sale of land and a nursing home existed. Extrinsic oral evidence was admitted to aid in the interpretation of the contract. The terms of the contract were not changed.

Because the remedy afforded in this case is not one for specific performance or to quiet title,[9] no precise description of the land is needed. Even if it were, the statute of frauds would not be violated because "[t]he description of land contained in a contract of sale or any option to purchase is sufficiently definite to satisfy the requirements of the Statute of Frauds 'whenever it is reasonably certain from the contract itself, or can be made certain through reference to record, contract, map or fact, by resort to extraneous evidence thereof, whether oral or written.' *McMahon* v. *Plumb*, 88 Conn. 547, 552, 92 A. 113 [1914]; *Peterson* v. *Bray*, 138 Conn. 227, 230, 83 A.2d 198 [1951]." *Pigeon* v. *Hatheway*, 156

[8] General Statutes § 52-550 provides in pertinent part: "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ."

[9] The trial court determined that the plaintiff could not obtain both a remedy of damages for breach of contract and specific performance, and the trial court denied specific performance. The plaintiff does not question this determination on appeal.

Conn. 175, 182, 239 A.2d 523 (1968). The statute of frauds was not violated because a written contract to sell land existed, and the evidence admitted was used properly to discern the intent of the parties.

The jury reached a reasonable conclusion based on the evidence in finding both negligent representation and breach of contract. The verdict reflects no manifest injustice so plain and palpable as to denote clearly that a mistake was made in the application of legal principles. The trial court abused its discretion by setting aside the award for damages for breach of contract. It should not have concluded, as a matter of law, that the contract was unambiguous and that no evidence supported a breach by the defendants. The trial court, however, was correct in refusing to set aside the jury award of damages for negligent misrepresentation.

## II

## ISSUES DECIDED BY THE COURT

The plaintiff claims that the trial court should not have determined that he was not entitled to prejudgment interest on the damages for breach of contract awarded by the jury and on the $155,000 deposit held by the defendants. The plaintiff argues that his entitlement to interest was a factual determination that should have been submitted to the jury. Both of these claims involved General Statutes § 37-3a.[10] The plaintiff also argues in the alternative that, even if the trial court properly excluded the issue from the jury, the court abused its discretion by concluding that the defendants did not wrongfully detain money under § 37-3a.

---

[10] General Statutes § 37-3a provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."

The testimony at trial, which the plaintiff does not dispute, was that the defendants had offered to return the plaintiff's deposit and that the plaintiff had refused to accept it. The $155,000 deposit, therefore, cannot be the subject of interest for a "detention of money after it becomes payable" as provided by § 37-3a. We turn next to the question of whether statutory interest should have been added to the damages awarded by the jury and whether the question was one for the jury or the court.

The trial court refused to charge the jury on the issue of interest and reserved the question for itself. The trial court correctly noted that there is no right to recover interest in a civil action unless a statute provides for interest. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 37, 664 A.2d 719 (1995). The trial court noted, therefore, that in this case the plaintiff's claim for prejudgment interest could only be provided for under § 37-3a.

The court reserved the issue of interest for itself because of its interpretation of the following language of *Bertozzi* v. *McCarthy*, 164 Conn. 463, 467, 323 A.2d 553 (1973): "The allowance of interest as an element of damages is, thus, primarily an equitable determination and a matter lying within the discretion of the trial court." Id., 467. The trial court, having determined the question was one of law for it to decide, then applied General Statutes § 37-3a, and concluded that because the evidence did not support a finding that the defendants wrongfully detained money owed to the plaintiff, no prejudgment interest was warranted. *Bertozzi*, however, was a case tried to the court for damages for failure of the defendants to pay the balance of a contract price to build a house. The trier of fact, therefore, was the trial court, which properly weighed the equities, including the fact that the sum owed was liquidated,

to determine that the defendants had not wrongfully deprived the plaintiff of a sum of money.

*Iseli Co.* v. *Connecticut Light & Power Co.*, supra, 211 Conn. 133, a case tried to a jury, addressed and resolved the issue of whether a trial court improperly divested itself of an exclusive judicial function by allowing the jury to determine whether to award pre-judgment interest. " 'Our cases have recognized that interest, as an element of damages, is . . . a matter within the jury's province. [*Eagar* v. *Barron*, 2 Conn. App. 468, 471, 480, A.2d 576 (1984)]; see also *Rosenblatt* v. *Berman*, 143 Conn. 31, 36, 119 A.2d 118 (1955); *Lokes* v. *Kondrotas*, 104 Conn. 703, 709, 134 A. 246 (1926).' *Canton Motorcar Works, Inc.* v. *DiMartino*, 6 Conn. App. 447, 464, 505 A.2d 1255, cert. denied, 200 Conn. 802, 509 A.2d 516 (1986) (applying General Statutes §37-3a) . . . . The cases upon which the defendant relies for the proposition that '[t]he allowance of interest . . . is . . . primarily an equitable determination and a matter lying within the discretion of the trial court'; *Bertozzi* v. *McCarthy*, 164 Conn. 463, 467, 323 A.2d 553 (1973); involved actions tried to the court rather than to the jury. *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 391, 406, 363 A.2d 160 (1975) . . . ." (Citations omitted.) Id., 143–44. Thus, the determination of whether interest pursuant to § 37-3a should be awarded is a question for the trier of fact. See also *Middlesex Mutual Assurance Co.* v. *Walsh*, 218 Conn. 681, 703, 590 A.2d 957 (1991).

The trial court, therefore, incorrectly concluded that whether interest should be awarded pursuant to § 37-3a is a legal question for the court. It is a jury question in those cases that involve "damages for the detention of money after it becomes payable." Id., 701; see also *Gillis* v. *Gillis*, 21 Conn. App. 549, 575 A.2d 230, cert. denied, 215 Conn. 815, 576 A.2d 544 (1990); *Canton Motorcar Works, Inc.* v. *DiMartino*, supra, 6 Conn. App. 464. The question then becomes whether the case is

appropriate for § 37-3a interest; there first must be a determination that the statute applies.

Parties claiming damages for breach of contract must have a statutory basis for a claim of interest. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 36–44; *The New York, New Haven & Hartford Railroad Co.* v. *The Ansonia Land & Water Power Co.*, 72 Conn. 703, 703–704, 46 A. 157 (1900); *Nielsen* v. *Wisniewski*, 32 Conn. App. 133, 140, 628 A.2d 25 (1993). We must, therefore, determine whether, as a matter of law, such a basis existed here. *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 37.

In the jury cases of which we are aware in which prejudgment interest was properly a jury question, namely *Iseli* v. *Connecticut Light & Power Company*, supra, 211 Conn. 133; *Gillis* v. *Gillis*, supra, 21 Conn. App. 549; *Canton Motorcar Works, Inc.* v. *DiMartino*, supra, 6 Conn. App. 447, the underlying claims were for liquidated sums due for services or services and materials or for reimbursement of specific sums.

Section 37-3a provides a substantive right that applies only to certain claims. *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, 22 Conn. App. 640, 651–53, 579 A.2d 545, cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990). It does not allow prejudgment interest on claims that are not yet payable, such as awards for punitive damages; *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 37; or on claims that do not involve the wrongful detention of money, such as personal injury claims; *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 301, 307, 472 A.2d 316 (1984). "Under § 37-3a, an allowance of prejudgment interest turns on whether the detention of the money is or is not wrongful under the circumstances. *Cecio Bros., Inc.* v. *Feldmann*, 161 Conn. 265, 275, 287 A.2d 374 (1971). *Newington* v. *General Sanitation Service Co.*, 196

Conn. 81, 90, 491 A.2d 363 (1985). . . ." (Internal quotation marks omitted.) *Spearhead Construction Corp.* v. *Bianco*, 39 Conn. App. 122, 134–35, 665 A.2d 86, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995). There are "well established propositions that § 37-3a provides for interest on money detained after it becomes due and payable, that the question under that statute is whether the money was wrongfully withheld . . . ." Id., 136. The statute, therefore, applies to claims involving the wrongful detention of money *after* it becomes due and payable.

Prejudgment interest pursuant to § 37-3a has been applied to breach of contract claims for liquidated damages, namely, where a party claims that a specified sum under the terms of a contract, or a sum to be determined by the terms of the contract, owed to that party has been detained by another party. See *Harris Calorific Sales Co.* v. *Manifold Systems, Inc.*, 18 Conn. App. 559, 559 A.2d 241 (1989). It has also been applied to breach of contract claims where the partial performance of one party caused the other party specific damages; *Sabo* v. *Strolis*, 148 Conn. 504, 172 A.2d 609 (1961); or to debts that had matured without payment; see *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 41; or to claims for consequential damages. *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 2 Conn. App. 322, 479 A.2d 249 (1984), aff'd in part, rev'd in part, 199 Conn. 683, 508 A.2d 438 (1986).[11]

---

[11] In *Neiditz* v. *Morton S. Fine & Associates, Inc.*, supra, 2 Conn. App. 329 n.10, we noted that the defendant originally had claimed error in the application of prejudgment interest to damages that were not liquidated, but the issue had been abandoned on appeal. No mention of the applicability of § 37-3a to a claim sounding in negligence for consequential damages in light of *Gionfriddo* v. *Avis Rent A Car System, Inc.*, supra, 192 Conn. 308, was made by the Supreme Court on review of our decision. *Neiditz* v. *Morton S. Fine & Associates, Inc.*, supra, 199 Conn. 692–93. The court, however, stated: "As the Appellate Court recognized, interest awarded under the statute is intended to compensate the prevailing party for a delay in obtaining money that rightfully belongs to him. *Porter* v. *Clerk of the Superior*

In *Nielsen* v. *Wisniewski*, supra, 32 Conn. App. 139, we determined that as a matter of law § 37-3a was inapplicable to claims for punitive damages because those damages do not become payable before judgment. In *Gionfriddo* v. *Avis Rent A Car System, Inc.*, supra, 192 Conn. 308, our Supreme Court concluded that requests for prejudgment interest in personal injury claims do not typically constitute a claim for the wrongful detention of money before the rendering of judgment, but that General Statutes § 52-192a[12] would govern those types of claims in which prejudgment interest is sought. Section 37-3a begins, "[e]xcept as provided in sections . . . 52-192a," interest may be awarded as damages for the detention of money after it becomes due. In such instances, § 37-3a pertains only to postjudgment interest. Id., 308.

Personal injury claims seek to make persons whole by monetarily compensating them for a loss negligently

*Court*, 368 Mass. 116, 330 N.E.2d 206 (1975). The statutory rate of interest embodied in §37-3a presumably reflects the legislature's view of the rate of interest that would have been obtainable while the money was being wrongfully withheld. During the period following the date when the second zoning approval became final, and its liability for prejudgment interest began to accumulate, the defendant was aware only of the possibility of an award of interest at the then prevailing rate of 6 percent." *Neiditz* v. *Morton S. Fine & Associates, Inc.*, supra, 691–92. The issue of the case concerned the retroactive application of an interest rate, rather than whether the statute applied to provide some interest.

[12] General Statutes § 52-192a provides in relevant part: "(a) After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may before trial file with the clerk of the court a written 'offer of judgment' . . . offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. . . .

"(b) After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount, computed from the date such offer was filed in actions commenced before October 1, 1981. In those actions com-

caused by others. Damages are typically uncertain and the purpose of the damages is to restore the injured, as nearly as money can, to the status they were enjoying and would have continued to enjoy prior to the negligent act. Such claims do not seek to regain money detained by another. In this case, the plaintiff filed a $5 million offer of judgment prior to trial, which would have provided him with prejudgment interest pursuant to § 52-192a from the time of the offer, had the jury's award been at least $5 million.

The damages for the breach of contract in this case are similar to damages in a personal injury claim in negligence where a party is seeking to be made whole for the loss caused by another. The damages claimed and awarded to the plaintiff were for the loss of the benefit of his bargain. In this case, neither party claimed to have performed fully or substantially under the contract so as to invoke the other's obligation to pay a liquidated sum or to provide services under the contract. See *Vincenzi* v. *Cerro*, 186 Conn. 612, 442 A.2d 1352 (1982); *Cecio Bros., Inc.* v. *Feldmann*, supra, 161 Conn. 265.

On the basis of our review of the applicable cases, we conclude that § 37-3a does not apply to these facts and that, therefore, the plaintiff was not entitled to an award of prejudgment interest pursuant to that statute. " 'Where the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it.' " *State* v. *Green*, 38 Conn. App. 868, 875, 663 A.2d 1085 (1995), quoting *Morris* v. *Costa*, 174 Conn. 592, 597–98, 392 A.2d 468 (1978).

The plaintiff next argues that the trial court improperly prohibited him from supplying evidence to show

menced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed . . . ."

damages of lost profits and refused to charge the jury on lost profits as an element of damages. The plaintiff argues that evidence should have been allowed to show lost profits because, but for the defendants' failure to sell a business, he would have owned an operable nursing home and would have received the profits thereof.

"There are no unbending rules as to the evidence by which [damages for breach of contract] are to be determined. *Gordon* v. *Indusco Management Corporation*, 164 Conn. 262, 273, 320 A.2d 811 (1973). The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . *Beckman* v. *Jalich Homes, Inc.*, 190 Conn. 299, 309–10, 460 A.2d 488 (1983)." (Internal quotation marks omitted.) *L. F. Pace & Sons, Inc.* v. *Travelers Indemnity Co.*, 9 Conn. App. 30, 41, 514 A.2d 766, cert. denied, 201 Conn. 811, 516 A.2d 886 (1986).

In this case, the plaintiff produced evidence to show his loss of the benefit of the bargain. This contract involved the sale of land and an operable nursing home at a price of $5.25 million. The plaintiff produced evidence to show the value of an operable nursing home at the time the contract should have been performed.

The three accepted methods for the valuation of real property are the comparable sales approach, the income approach and the reproduction cost approach. *Four D's, Inc.* v. *Mattera*, 25 Conn. App. 308, 315, 594 A.2d 484 (1991). " 'In the case of an operating company, the primary consideration in the valuation process . . . is generally considered to be not the net asset value, but rather the earning capacity of the business. . . . In valuing a going concern the "willing buyer" will place primary emphasis on the earning capability of the assets he is considering buying.' Vass, 'Factors That Are Pres-

ently Being Emphasized in Valuing a Closely-Held Corporation,' 38 J. Tax. 356 (1973). 1 Bonbright, Valuation of Property (1937) p. 244; 16 Proof of Facts 2d, Forensic Economics—Valuation of Businesses and Business Losses § 7, p. 271." *West Haven Sound Development Corp.* v. *West Haven,* 201 Conn. 305, 329, 514 A.2d 734 (1986).

A commercial real estate appraiser testified for the plaintiff and set the value of the property at $7 million on the basis of the income approach. This approach took into account anticipated profits in the future operation of the nursing home, which necessarily enhanced the value of the property at the time the contract was to have been performed. As a result of a breach of that contract, the plaintiff received $938,000 in damages, which constituted the jury's determination of the benefit of the bargain, namely, the difference between the contract price and the fair market value of the land and building. The jury assessed damages in accordance with the proper instructions of the court. The plaintiff, therefore, has already been compensated for any loss related to not having a piece of land on which he could conduct a nursing home business and, therefore, should not be permitted to collect damages for this loss twice. " 'Where the general measure [of damages] used is the benefit of the bargain measure . . . care must be exercised to avoid giving the plaintiff an unwarranted bonus.' Dobbs, Remedies § 9.2, p. 599." *Miller* v. *Appleby,* 183 Conn. 51, 59, 438 A.2d 811 (1981).

The plaintiff relies on *Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.,* 226 Cal. App. 3d 442, 277 Cal. Rptr. 40 (1990), to support his position that he should have been permitted to present evidence of lost profits because he claims, as a matter of law, that he is entitled to prove such damages in a breach of contract claim for the sale of a business. That case is distinguishable from the present case because, in that case, the

subject of the contract was the sale of a business and the plaintiff did not seek or receive other damages. Id., 453. Furthermore, in permitting an award for lost profits, the *Brandon & Tibbs* court painstakingly reviewed the award to ensure that the calculated damages did not provide an excessive recovery. Id., 452–53. While lost profits for breach of contract sometimes may be an appropriate remedy; *Kay Petroleum Corp.* v. *Piergrossi*, 137 Conn. 620, 79 A.2d 829 (1951); such damages cannot create a double or excessive recovery for the prevailing party. *West Haven Sound Development Corp.* v. *West Haven*, supra, 201 Conn. 330.

The plaintiff is utilizing a variant of the income approach in his claim for damages for the loss of profits. The plaintiff is not entitled to recover both his loss of the benefit of his bargain for the sale of land and a viable business thereon, and lost profits resulting from the failure to obtain that business. The trial court properly precluded evidence of lost profits and refused to instruct the jury on the issue. *West Haven Sound Development Corp.* v. *West Haven*, supra, 201 Conn. 330.

The defendants dispute the trial court's conclusion that the plaintiff should receive a refund of $155,000, which constitutes the amount of the deposit the plaintiff had paid pursuant to the contract. The trial court had instructed the jury not to consider the amount of the deposit in calculating damages for breach of contract.[13]

---

[13] The trial court charged the jury with the following instruction: "One other thing I want to point out to you at this point is that there was evidence here, originally a $5000 deposit followed by $150,000 payment for a total of $155,000. In the ultimate outcome of this case that has to be taken into account, but as one of the attorneys has identified for you, the court is considering whether or not to award specific performance in this case and until you award your damages and until I determine whether or not specific performance is granted, I am unable to determine and you are unable to determine whether or not the $155,000—what should happen to it, how it should be handled. So, I'm asking you in consideration of your verdict to proceed without considering the $155,000. The court will make an appropriate adjustment in damages if necessary at the end of the case to take

The trial court subsequently concluded that the plaintiff was not entitled to specific performance resulting in the purchase of the property, and that the defendants must return the $155,000 deposit.

The defendants argue that under the contract, the plaintiff had the option of rescinding the contract and having his deposit returned but, because the plaintiff chose to seek damages for the contract's breach, the plaintiff could not also seek a rescission. In other words, the defendants argue that the plaintiff cannot recover twice for damages arising under the contract. Because the jury, however, was not permitted to take the deposit into account when awarding damages, the trial court's subsequent award of the deposit does not constitute a double recovery, and a return of this deposit is proper. See *Williams* v. *Breyer*, 21 Conn. App. 380, 384, 573 A.2d 765, cert. denied, 215 Conn. 812, 574 A.2d 542 (1990).

The judgment is reversed and the case is remanded with direction to render judgment for the plaintiff in the total amount of $1,098,001, which equals the $5001 awarded by the jury for negligent misrepresentation, the $938,000 awarded by the jury for breach of contract, and the return of the $155,000 deposit made by the plaintiff, as ordered by the court.

In this opinion the other judges concurred.

---

that into account under the rules of law. But at this point, in deciding what you award, you will not include that one way or another, either as a credit to one side or as a deduction from damages on the other side, in awarding your damages in this case."